1

2

3

4

5

6

7

8                            IN THE UNITED STATES DISTRICT COURT

9                            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DANNY GEROME YOUNG,

11            Plaintiff,                    No. CIV S-03-2225 GEB KJM P

12       vs.

13   J. PULSIPHER, et al.,                 ORDER AND

14            Defendants.                  FINDINGS & RECOMMENDATIONS

15   _____/

16            Plaintiff is a state prison inmate proceeding pro se with a civil rights action under

17   42 U.S.C. § 1983, alleging that between May 31, 2001 and October 9, 2002, defendants

18   Pulsipher, a correctional lieutenant, and Steever, Bick and Andreasen, all doctors, were

19   deliberately indifferent to his serious medical needs.[1]

20            Defendants have filed a motion for summary judgment.

21   /////

22

23

24   _____

25       [1]  Plaintiff's complaint includes a lengthy discussion of the authorities' perceived failure
     to provide adequate medical care as well as references to prior litigation on the subject, none of
26   which is directly germane to the instant litigation.  The allegations giving rise to this lawsuit
     begin at page seven of the narrative complaint, attached to the form complaint.

I. Facts[2]

    A. Medical Defendants

        Plaintiff has been diagnosed with anklyosing spondylitis (AS), which is a chronic inflammatory condition that affects the joints between the vertebrae of the spine and the joints between the spine and the pelvis.  It causes back pain, which is often eased by a bent-over posture; this may lead to kyphosis (curvature of the thoracic spine).  Because the condition is rheumatic, it can cause inflammation in other joints and in organs, such as the eyes, heart, kidneys and lungs.  If the condition is progressive, it may lead to deterioration in the bone and cartilage, causing fusion in the spine and other joints with chronic pain and a decrease in mobility.  MSJ, Ex. A ¶¶ 6-8 (Declaration of Dr. J. Bick).[3]  Moreover, as the disease progresses, the upper back tends gradually to stoop forward.  Id., Ex. A ¶ 9.

        Plaintiff's condition is progressive.  Id., Ex. A ¶ 10.  He was unable to tolerate treatment with non-steroid anti-inflammatory drugs, but has been given medications, including narcotics, for his pain.  Id., Ex. A ¶ 10.  In addition, he has been given physical therapy and a number of supportive aids, including hot showers, soft shoes, cervical collar, wheelchair, cane,

/////

/////

---

[2]  Both sides have submitted various medical records from plaintiff's California Department of Corrections and Rehabilitation (CDCR) medical file.  Although neither party has established a foundation for the admissibility of the records, neither side objects to the others' submission; indeed, both often rely on the same records.  See, e.g., Motion for Summary Judgment (MSJ), Ex. A ¶ 40, Attachment 26; Opposition (Opp'n), Declaration of Danny Gerome Young (Young Decl.) ¶ 1 & Ex. A&A (both are 6/27/02 progress notes from Dr. Capozolli).

    Moreover, although the records may not be properly authenticated, based on both parties' reliance on them and the fact that they appear to be plaintiff's medical records, the court will rely on them in resolving the motion for summary judgment.  See Fed. R. Evid. 901(a) & (b)(4).

    Plaintiff does object to defendants' reliance on his deposition on the ground that he was never given a copy to review and correct.  Pl.'s Statement of Disputed Facts ¶ 31.  Because the deposition is not properly authenticated, the court will not consider it in resolving the motion.  See Orr v. Bank of America, NT & SA, 285 F.3d 764, 774 (9th Cir. 2002) (requirements for authenticating a portion of a deposition).

[3]  Defendants' exhibits are attached to their Statement of Undisputed Facts.

lower bunks and firm beds, though he has not consistently been given a firm bed.  Id., Ex. A

¶¶ 10-11; Opp'n, Young Decl. ¶¶ 8 & 28.  A firm bed is important for the maintenance of posture

and to ease the pain of the disease.  Opp'n, Ex. A&A.[4]

Plaintiff was housed at the California Medical Facility during the events described

in the complaint.  Beginning at least as early as 1999, Dr. Andreasen signed medical chronos

recommending that plaintiff be given a firm bed and a lower bunk.  MSJ, Ex. A ¶¶ 12-13 &

Attachments 1-2.  In December 1999, an order was written, authorizing metal backing, or a

"cookie sheet" bed for plaintiff.  Id., Ex. A, Attachment 2 at 2.  Later in December, when

plaintiff complained that his bed did not comply with doctors' orders, Dr. Andreasen wrote a

chrono authorizing the construction of a cookie sheet bed for plaintiff.  Id., Ex. A ¶¶ 14-15 &

Attachments 3-4.  Throughout the period covered by the complaint in this case, Dr. Andreasen

signed a variety of medical chronos authorizing the continuation of plaintiff's cookie sheet bed

and other supportive aids.  Id., Ex. A ¶¶ 16-19 & Attachments 5-8, 27.

In October 2000, plaintiff was moved to Wing M-1 and placed in bed 107L,

which had a cookie sheet mattress.  Id., Ex. A ¶ 20 & Attachment 9.  On May 31, 2001, plaintiff

and the other residents of Wing M-1 were moved to Wing H-2; plaintiff was placed in Bed No.

226L, which had springs rather than a cookie sheet.[5]  Id., Ex. A ¶¶ 21-22; Young Decl. ¶ 8.

On July 18, 2001, plaintiff reported to Dr. Anderson that he had lost his cookie

sheet bed and so had placed his mattress on the floor.  MSJ, Ex. A ¶ 24 & Attachment 11.  Dr.

Anderson wrote a new chrono, co-signed by Dr. Andreasen, for a cookie sheet mattress or for

permission for plaintiff to put his mattress on the floor.  Id., Ex. A ¶ 24 & Attachments 11-12.

Because the bunks were very close together in H-2, plaintiff was not able to put his mattress on

_____

[4]  Ex. A&A immediately follows Ex. A.

[5]  The parties describe the springs differently: defendants call this a steel spring bed;
plaintiff insists that it is a "sagging spring" bed.  Compare MSJ, Ex. A ¶ 22 and Young Decl. ¶ 8.
Whether the mattress was on steel or sagging springs is not dispositive.

1  the floor very often; if someone was in the upper bunk, that person would be unable to get down

2  from the bunk without stepping on plaintiff if he were on the floor.  Young Decl. ¶ 10;

3  Declaration of Shawn LaCount (LaCount Decl.) ¶ 7.[6]

4         When plaintiff saw Dr. Enright, a psychiatrist, on August 23, 2001, he mentioned

5  that he did not have the proper mattress despite his medical chrono, but that he did not want to

6  file a grievance because it would get him into trouble.  MSJ, Ex. A ¶ 26 & Attachment 15;

7  Opp'n, Ex. B-1.  Plaintiff repeated his complaint when he saw his rheumatologist, Dr. Anderson,

8  on October 10, 2001, and again on November 29, 2001, when he saw his mental health case

9  manager, Dr. Thiem.  MSJ, Ex. A ¶¶ 28-29 & Attachments 17-18.  He told Dr. Thiem that he

10  was sleeping on the floor because it was not possible for him to get a metal bed.  Id., Ex. A,

11  Attachment 18.

12         On December 18, 2001, plaintiff told Dr. Anderson that staff members were not

13  respecting his medical chronos and asked the doctor to speak with the custody staff about this.

14  Dr. Anderson told him that "if chronos are not respected he can complain through usual channels

15  or I would be happy to speak to custody if they have questions."  Id., Ex. A ¶ 30 & Attachment

16  19.

17         On February 6, 2002, plaintiff submitted a Request for Reasonable

18  Accommodation (CDCR 1864) to Lieutenant Pulsipher, the program lieutenant for unit one,

19  asking that he be moved to bed J-153 (in J-Wing) because that bed had been specially designed

20  for him with hard steel backing.  Id., Ex. A ¶ 32; id., Ex. B (Declaration of J. Pulsipher) ¶ 4

21  (worked in plaintiff's unit at time); Opp'n, Ex. Y(A).

22  /////

23

24         [6]  The LaCount declaration and a declaration from Carlos Kinkeade are attached to
plaintiff's supplement to his pretrial statement, filed February 13, 2006.  Because these
25  declarations are in the record and plaintiff refers to them in his opposition, the court may
consider them on summary judgment.  Carmen v. San Francisco Unified School District, 237
26  F.3d 1026, 1029 (9th Cir. 2001).

1    A little over two weeks later, on February 23, 2002, plaintiff was moved to bed I-

2   332L, which had a cookie sheet mattress. Id., Ex. A ¶ 33, Attachment 9.  Plaintiff had two more

3   bed changes on March 11, 2002, both to beds with springs.  Id., Ex. A ¶ 34 & Attachment 9.  He

4   was moved again on March 14, to bed J-109L in a dorm.  Id., Ex. A ¶ 35.  There, plaintiff could

5   not put his mattress on the floor because his bunk mate would not be able to get down without

6   stepping on plaintiff.  Young Decl. ¶ 12.  Eventually, he moved his mattress into a small space

7   used by the inmates as an exercise area.  Kinkeade Decl. ¶ 8; LaCount Decl. ¶ 7.

8    On May 26, 2002, plaintiff wrote a letter to this court, complaining that he was

9   not being given a cookie sheet bed as specified by his medical chronos, and sent copies to

10  defendants Bick, Andreasen and Pulsipher.  See Young v. California Medical Facility, Civ. No.

11  S-02-1172 WBS JFM P; Opp'n, Ex. Y.

12   On May 29, 2002, plaintiff complained about his bed to Dr. Steever.  Although

13  Dr. Steever offered plaintiff a bed board, plaintiff rejected it and asked for a custom bed or the

14  bed called for in the medical chronos.  Dr. Steever told plaintiff that it was outside his purview to

15  be "proactive" in obtaining a custom bed for plaintiff.  MSJ, Ex. A ¶ 37 & Attachment 23;

16  Young Decl. ¶ 15.[7]

17   Several days later, on June 3, 2002, Dr. Andreasen wrote another chrono for a

18  cookie sheet bed or for permission for plaintiff to put his mattress on the floor.  MSJ, Ex. A ¶ 38

19  & Attachment 24.

20   Plaintiff returned to see Dr. Steever on June 24, 2002.  Dr. Steever told plaintiff

21  he had been unaware that a bed board and a cookie sheet were not the same thing.  He offered to

22  write a chrono for a cookie sheet mattress, but learned that Dr. Andreasen had already done so.

23  Id., Ex. A ¶ 39 & Attachment 25.

24

25    [7] Plaintiff makes much of the fact that various chronos in his medical file show that a bed
    board was not appropriate.  See, e.g., Opp'n, Ex. I.  It is not clear, however, that these chronos,
26  written during the 90s, were in front of Dr. Steever when he offered the bed board.

On June 27, 2002, plaintiff complained to Dr. Capozolli, a neurologist, about his problems in securing a cookie sheet mattress.  He complained that he was in more pain and was embarrassed about his stooped posture.  Dr. Capozolli noted that a rigid bed was appropriate for plaintiff and left a message for Dr. Andreasen about housing plaintiff in G-3 (or G-Wing), which had cookie sheet beds.  Id., Ex. A ¶ 40 & Attachment 26; Young Decl. ¶ 16; Opp'n, Ex. A&A. G-3 houses inmates with particular housing needs associated with long-term chronic medical problems.  Opp'n., Ex. Y-1 (Andreasen Interrogatory Response No. 6).  Dr. Capozolli had taken similar action on January 4, 2000, when, after plaintiff complained of difficulties in obtaining his cookie sheet bed, Capozolli made a note to speak to Dr. Andreasen about it.  Opp'n, Ex. H&H. Although Dr. Andreasen had the authority to write an order transferring an inmate to G-3, he did not believe plaintiff's medical problem required such a move.  Opp'n, Ex. Y-1 (No. 6).

Plaintiff returned to Dr. Anderson on July 3, 2002 and complained that he had not received his cookie sheet mattress.  Dr. Anderson confirmed that the appropriate chronos had been written and noted that "instituting cookie sheet is custody responsibility."  MSJ, Ex. A ¶ 41 & Attachment 27.

On September 6, 2002, Dr. Andreasen wrote a chrono noting that plaintiff should be given a cookie sheet mattress or be allowed to place his mattress on the floor.  Id., Ex. A ¶ 44 & Attachment 30; Opp'n, Ex. T.

On September 12, 2002, plaintiff attended an interdisciplinary mental health meeting and mentioned his frustration that "custody will not give me the bed I need."  MSJ, Ex. A ¶ 45 & Attachment 31; Opp'n, Ex. S-1.  The "treatment recommendations" included a plan for "CCI Miller [to] advocate for the cookie sheet mattress."  Id.

The parties disagree about plaintiff's next bed move: defendants claim that on September 25, 2002, plaintiff was moved to a bed with springs; plaintiff says he was moved to the bed that had been constructed for him and had previously been at J-153.  MSJ, Ex. A ¶ 46 & Attachment 9; Young Decl. ¶ 13.  He remained there only two or three days.  Young Decl. ¶ 13.

1          On September 25, 2002, plaintiff submitted a grievance, complaining that he was

2   not being given the type of bed ordered by his doctors.  MSJ, Ex. A ¶ 47 & Attachment 32.

3          On October 9, 2002, plaintiff was moved to Wing H-1 and given bed 120L, which

4   had a cookie sheet mattress.  Id., Ex. A ¶ 48 & Attachment 9.

5          On October 20, 2002, Dr. Bick denied plaintiff's grievance on the first level

6   because plaintiff had been given a cookie sheet bed in response to Dr. Andreasen's September 6

7   chrono.  Id., Ex. A, ¶ 50 & Attachment 32.  According to Dr. Bick, as Chief Medical Officer, he

8   was not responsible for ensuring that plaintiff was given a cookie sheet bed or for approving Dr.

9   Andreasen's chronos; custodial staff were responsible for housing plaintiff in compliance with

10  the chronos.  Opp'n, Ex. G  (Bick Interrogatory Response No. 6).

11         According to Dr. Bick, medical staff acted appropriately to accommodate

12  plaintiff's needs in the custodial setting and claims there is

13            no compelling medical evidence to demonstrate that Young's
              condition suffered because of the actions or lack of actions in this
14            case.  This includes Young's subjective claim that having to
              periodically sleep on a bed other than one he finds acceptable for
15            his condition, resulted in the loss of flexion in his neck.

16  MSJ, Ex. A ¶ 74.  In contrast, plaintiff asserts that his struggles to secure a proper bed led to

17  depression, loss of the range of motion in his spine and pain, all of which decreased after he was

18  given a proper bed for an extended period of time.  Opp'n, Exs. AAA[8] (Attachments 1 (notes of

19  2006 exam noting improved neck flexibility since 2002), 2(6/25/01 triage note re: pain)) & M-1

20  (interdisciplinary mental health notes reporting plaintiff's claims of depression).

21         B.  Lieutenant Pulsipher

22         During the time covered by the complaint, Pulsipher was the Second Watch

23  Program Lieutenant, working a shift from 6:45 a.m. until 2:45 p.m.  MSJ, Ex. B ¶ 4.

24  /////

25  _____

26       [8]  This exhibit follows Exhibit Z.  Plaintiff has labeled it A&A, but the court will refer to
     it as AAA because it is the second exhibit labeled "A&A."

1          The parties dispute the level of Pulsipher's involvement in housing matters:

2   Pulsipher avers that he had little day-to-day experience with inmate needs, such as plaintiff's

3   need for a firm bed, and was not aware of all the medical orders for the inmates on the unit;

4   plaintiff on the other hand says that, based on his experience as an institutional clerk, he knows

5   that the unit lieutenants are responsible for signing off on cell moves and that he personally told

6   Pulsipher about his medical needs on several occasions.  Id., Ex. B ¶ 6; Young Decl. ¶¶ 9, 13-14,

7   17-18 & Ex. M-2.[9]  Pulsipher acknowledges that plaintiff told him of plaintiff's need for a firm

8   bed, but that every time Pulsipher checked into the matter, he found plaintiff to be appropriately

9   housed.  MSJ, Ex. B ¶ 7.

10          Pulsipher avers that he was not a part of the program change, which required the

11  inmates on M-Wing, including plaintiff, to move to H-2 nor was he aware that when plaintiff was

12  moved to H-2 he was not given a cookie sheet bed.  He also avers that he was not even on duty

13  during many of plaintiff's bed moves, was not required to authorize the moves and was not aware

14  that plaintiff was often moved to a bed with springs.  Id., Ex. B ¶ 9.  Plaintiff contends, however,

15  that after he was moved to H-2, he asked Pulsipher's help in securing a cookie sheet bed.  Young

16  Decl. ¶ 9.

17          On February 6, 2002, as noted above, plaintiff submitted the CDC-1824, a

18  Request for Reasonable Accomodation, asking for a cookie sheet bed.  Pulsipher does not recall

19  seeing or handling the form; plaintiff avers that he handed the form to Pulsipher and walked

20  behind him as Pulsipher read it.  MSJ, Ex. B ¶ 12; Young Decl. ¶ 4.

21          The parties dispute whether Pulsipher is responsible for plaintiff's bed moves.

22  Pulsipher avers that sergeants dealt with the impact of medical orders on sleeping arrangements;

23  plaintiff claims that he went to Pulsipher personally concerning his cell moves.  MSJ, Ex. B ¶ 18;

24  Young Decl. ¶¶ 14, 18.

25  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

26          [9]  This is not a chrono signed by Pulsipher, but rather a 1992 chrono about one of
    plaintiff's bed moves, signed by a different lieutenant.  It is of limited relevance in this case.

8

1    Pulsipher asserts that sleeping on the floor is not appropriate from a custody point

2    of view, but notes that even so, Unit One officers accommodated plaintiff's medical chronos and

3    allowed him to sleep on the floor.  MSJ, Ex. B ¶¶ 19-20.  Plaintiff, however, contends that he did

4    not have the room to sleep on the floor because of the limited space in the dorms to which he was

5    assigned and because officers told him they could not see him when he was on the floor.  Young

6    Decl. ¶¶ 28, 30.

7    During the period between May 31, 2001 and October 9, 2002, plaintiff was given

8    a bed with springs during four periods:  from May 31, 2001 until July 6, 2001; July 7, 2001 until

9    February 23, 2002; March 11, 2002 until May 1, 2002; and September 24, 2002 until October 9,

10   2002.  MSJ, Ex. A, Attachment 9 & Ex. B ¶ 15.

11   II.  What Is Not Material In These Proceedings

12   Both parties present a wealth of evidence about events occurring after October 9,

13   2002.  Plaintiff's medical care and housing before May 31, 2001 and after this October date is

14   not relevant, because it is not covered in the complaint, unless it sheds light on dispositive issues.

15   Moreover, as plaintiff notes in his opposition, the "issue in controversy" is so limited.  Opp'n at

16   2.

17   Defendants present evidence about plaintiff's disruptive and assaultive behavior,

18   which, they claim, often led to a cell-move for plaintiff; they intimate that plaintiff's problems

19   with obtaining a cookie sheet bed were the result of his behavior.  Predictably, plaintiff offers a

20   rebuttal to this evidence.  In fact, the only bed move made because of plaintiff's behavior during

21   the time at issue was one on February 23, 2002, when plaintiff was moved from a bed with

22   springs to a cookie sheet bed in administrative segregation.  MSJ, Ex. A ¶ 78 & Attachment 9.

23   Plaintiff attacks Dr. Andreasen for writing chronos approving his transfer and Dr.

24   Steever for refusing to give plaintiff pain medication on June 24, 2002.  Id., Ex. A, Attachment

25   25; see also Pl.'s Statement of Disputed Facts ¶¶ 27 & 40.  These claims were not included in the

26   complaint.  See Complaint (Compl.) at 10-13.

1   Plaintiff devotes some energy to demonstrating that Pulsipher gave the bed, which

2   had been retrofitted for plaintiff, to a "writ-writer" in order to appease the latter.  Young Decl.

3   ¶ 11; Kinkeade Decl. ¶ 6; LaCount Decl.¶ 4.  Plaintiff was not entitled to the specific bed that

4   had been retrofitted, but rather to a bed that met his medical needs.  Dobbin v. Artuz, 143

5   F.Supp.2d 292, 302 (S.D.N.Y. 2001).

6   In addition, plaintiff alleges Deputy Warden Valadez ordered Unit One to give

7   plaintiff bed J-153 and that he showed this order to Pulsipher; Pulsipher denies that such an order

8   exists.  MSJ, Ex. B ¶ 13.  The exhibit on which plaintiff relies for this claim does not support his

9   contention, for it is only an account of a determination that plaintiff did not belong in segregation

10  for refusing a bed move and could be released back to J-1, an event that occurred in 1998; it says

11  nothing about bed J-153.  Opp'n, Ex. Y-1 at 1.

12  III.  Standards For A Summary Judgment Motion

13  Summary judgment is appropriate when it is demonstrated that there exists "no

14  genuine issue as to any material fact and that the moving party is entitled to a judgment as a

15  matter of law."  Fed. R. Civ. P. 56(c).

16  Under summary judgment practice, the moving party

17      always bears the initial responsibility of informing the district court
        of the basis for its motion, and identifying those portions of "the
18      pleadings, depositions, answers to interrogatories, and admissions
        on file, together with the affidavits, if any," which it believes
19      demonstrate the absence of a genuine issue of material fact.

20  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

21  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

22  judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

23  to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

24  after adequate time for discovery and upon motion, against a party who fails to make a showing

25  sufficient to establish the existence of an element essential to that party's case, and on which that

26  party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof

10

1  concerning an essential element of the nonmoving party's case necessarily renders all other facts

2  immaterial." Id.  In such a circumstance, summary judgment should be granted, "so long as

3  whatever is before the district court demonstrates that the standard for entry of summary

4  judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

5          If the moving party meets its initial responsibility, the burden then shifts to the

6  opposing party to establish that a genuine issue as to any material fact actually does exist. See

7  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

8  establish the existence of this factual dispute, the opposing party may not rely upon the

9  allegations or denials of its pleadings but is required to tender evidence of specific facts in the

10 form of affidavits, and/or admissible discovery material, in support of its contention that the

11 dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

12 must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

13 of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

14 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

15 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

16 return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

17 1436 (9th Cir. 1987).

18         In the endeavor to establish the existence of a factual dispute, the opposing party

19 need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

20 claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

21 versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

22 judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

23 genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

24 committee's note on 1963 amendments).

25         In resolving the summary judgment motion, the court examines the pleadings,

26 depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

1    any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

2    477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

3    court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

4    Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

5    produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

6    Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

7    1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

8    show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

9    as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

10   'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

11              On May 26, 2004, the court advised plaintiff of the requirements for opposing a

12   motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154

13   F.3d 952, 957 (9th Cir. 1998); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

14   IV.  Analysis

15              In Estelle v. Gamble, 429 U.S. 97, 106 (1976), the Supreme Court held that

16   inadequate medical care did not constitute cruel and unusual punishment cognizable under

17   section 1983 unless the mistreatment rose to the level of "deliberate indifference to serious

18   medical needs."

19              In the Ninth Circuit, the test for deliberate indifference consists of
     two parts. First, the plaintiff must show a serious medical need by
20              demonstrating that failure to treat a prisoner's condition could
     result in further significant injury or the "unnecessary and wanton
21              infliction of pain." Second, the plaintiff must show the defendant's
     response to the need was deliberately indifferent.  This second
22              prong-defendant's response to the need was deliberately
     indifferent-is satisfied by showing (a) a purposeful act or failure to
23              respond to a prisoner's pain or possible medical need and (b) harm
     caused by the indifference. Indifference may appear when prison
24              officials deny, delay or intentionally interfere with medical
     treatment, or it may be shown by the way in which prison
25              physicians provide medical care.

26   Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations & quotations omitted); see

                                                   12

1   also McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir.1992), overruled in part on other grounds,

2   WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir.1997).

3            There is no Eighth Amendment violation if any delay in treatment is not harmful.

4   Shapely v. Nevada Bd. Of State Prison Com'rs., 766 F.2d 404, 407 (9th Cir. 1985).  However,

5   unnecessary continuation of pain may constitute the "harm" necessary to establish an Eighth

6   Amendment violation from delay in providing medical care.  McGuckin, 974 F.2d at 1062.

7            A showing of merely inadvertent or even negligent medical care is not enough to

8   establish a constitutional violation.  Estelle, 429 U.S. at 105-06; Frost v. Agnos, 152 F.3d 1124,

9   1130 (9th Cir. 1998).  A difference of opinion about the proper course of treatment is not

10  deliberate indifference nor does a dispute between a prisoner and prison officials over the

11  necessity for or extent of medical treatment amount to a constitutional violation.  See, e.g.,

12  Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004); Sanchez v. Vild, 891 F.2d 240, 242 (9th

13  Cir. 1989).

14           A medical need is serious if failure to treat the condition could cause further

15  significant injury or the unnecessary and wanton infliction of pain.  McGuckin, 974 F.2d at 1059.

16           The existence of an injury that a reasonable doctor or patient would find
             important and worthy of comment or treatment; the presence of a medical
17           condition that significantly affects an individual's daily activities; or the
             existence of chronic and substantial pain are examples of indications that a
18           prisoner has a "serious" need for medical treatment

19  Id. at 1060.

20           Defendants have no quarrel with the proposition that AS is a serious medical

21  condition, requiring treatment.  Mem. P. & A. in Supp. Mot. for Summ. J. at 7.

22       A.  Dr. Steever

23           The undisputed evidence shows that on one occasion, Dr. Steever offered plaintiff

24  a bed board that did not meet his medical needs and that when he learned of his mistake, he

25  offered to write a chrono for a cookie sheet bed.  MSJ, Ex. A ¶¶ 37 & 39.  That Dr. Steever was

26  wrong about a bed board on one occasion does not show deliberate indifference, particularly in

1   light of his subsequent offer to write a chrono for a cookie sheet bed.  Estelle, 429 U.S. at 105-
2   06.

3             The evidence does show that Dr. Steever declined to be proactive in obtaining a
4   custom bed for plaintiff because it was outside his purview.  Plaintiff has presented nothing
5   suggesting what Dr. Steever could have done beyond writing a chrono, which would have been
6   duplicative of the chronos written by Dr. Anderson and Dr. Andreasen; he has not offered
7   evidence showing what authority, if any, Dr. Steever had over his placement or even that his
8   being "proactive" would have resulted in plaintiff's being assigned to a cookie sheet bed.  Dr.
9   Steever is entitled to summary judgment.

10            B.  Dr. Bick

11            Although plaintiff sent copies of correspondence about his bed to Dr. Bick, the
12  evidence he has submitted in opposition to summary judgment shows that Dr. Bick, the Chief
13  Medical Officer, was not responsible for ensuring that plaintiff was given a cookie sheet bed.
14  Once the chronos were written, it was the responsibility of the custody staff to see that the orders
15  were carried out.  Opp'n, Ex. G (No. 6).  By the time Dr. Bick denied plaintiff's grievance, on
16  October 20, 2002, plaintiff had a cookie sheet bed.  MSJ, Ex. A, Attachment 9.  Dr. Bick is
17  entitled to summary judgment.

18            C.  Dr. Andreasen

19            The undisputed evidence shows that Dr. Andreasen wrote a number of chronos for
20  a cookie sheet bed or for authorization for defendant to sleep on the floor when he did not have
21  such a mattress.  See, e.g., MSJ, Ex. A, Attachments 11, 12 & 24.  The undisputed evidence also
22  shows that plaintiff made a number of complaints to medical staff that he was not being given the
23  bed called for in the chronos and that staff often noted it was the responsibility of the custody
24  staff to act on the chronos.  See MSJ, Ex. A, Attachment 27 (7/3/02 visit to Dr. Anderson, who
25  noted that "instituting cookie sheet is custody responsibility").
26  /////

1    What makes Dr. Andreasen's situation different is that he had the authority to

2 transfer plaintiff to G-3, a medical wing with cookie sheet beds.  Opp'n, Ex. Y-1 (Andreasen

3 Interrogatory Response No. 6).  In fact, Dr. Capozzoli, plaintiff's neurologist, sought Dr.

4 Andreasen's consent to have plaintiff transferred to G-3.  Opp'n, Ex. H&H.  Although Dr.

5 Andreasen says that plaintiff's medical problem did not require such a move, there is no

6 explanation for this conclusion.  Moreover, the fact that custody staff were responsible for acting

7 in compliance with the chronos may not absolve Dr. Andreasen from liability when he had the

8 authority to transfer plaintiff to a wing where his medical needs would be met.  Scott v. Garcia,

9 370 F.Supp.2d 1056, 1070-71 (S.D. Cal. 2005).

10    In addition, there is disputed evidence concerning the impact of plaintiff's

11 bedding on his medical condition: according to plaintiff, being forced to sleep on a bed with

12 springs, whether steel or sagging, caused him pain and depression and decreased flexion in his

13 neck; according to Dr. Bick, there is no objective evidence of any impact on plaintiff's health.

14    Accordingly, there is a triable issue of fact as to whether Dr. Andreasen was

15 deliberately indifferent to plaintiff's serious medical needs.

16    Dr. Andreasen also argues, though, that he is entitled to qualified immunity.

17 Government officials performing discretionary functions generally are shielded from liability for

18 civil damages insofar as their conduct does not violate clearly established statutory or

19 constitutional rights of which a reasonable person would have known.  Harlow v. Fitzgerald, 457

20 U.S. 800, 818 (1982).

21    In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court set forth a particular

22 sequence of questions to be considered in determining whether qualified immunity exists. The

23 court must consider this threshold question: "Taken in the light most favorable to the party

24 asserting the injury, do the facts alleged show the officer's conduct violated a constitutional

25 right?"  Id. at 201.  If no constitutional right was violated if the facts were as alleged, the inquiry

26 ends and defendants prevail.  Id.  The court has found that the disputed evidence with regard to

1  Dr. Andreasen's declining to exercise his authority to transfer plaintiff to G-3 creates a disputed

2  issue of fact.

3          If, however,

4          a violation could be made out on a favorable view of the parties'
           submissions, the next, sequential step is to ask whether the right

5          was clearly established.... 'The contours of the right must be
           sufficiently clear that a reasonable official would understand that

6          what he is doing violates that right.'... The relevant, dispositive
           inquiry in determining whether a right is clearly established is

7          whether it would be clear to a reasonable officer that his conduct
           was unlawful in the situation he confronted.

8

9  Id. at 201-02 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  The reasonableness of

10  a defendant's conduct is judged "against the backdrop of the law at the time of the conduct."

11  Brosseau v. Haugen, 543 U.S. 194, 198, 125 S. Ct. 596, 599 (2004).  The defendant should not

12  be subject to liability if the law at that time did not clearly establish that the defendant's actions

13  would violate the Constitution.  Id.  The Supreme Court has emphasized that "the qualified

14  immunity inquiry must be undertaken in light of the specific context of the case."  Id.  The court

15  must determine whether the contours of the right were sufficiently clear that a reasonable official

16  would understand that what he was doing violated that right.  Anderson, 483 U.S. at 640.

17  "Sufficient clarity" for the purposes of the qualified immunity inquiry does not require precedent

18  directly on point; it is suffcient if "unlawfulness is apparent in light of preexisting law. . . ."

19  Devereaux v. Abbey, 263 F.3d 1070, 1075 (9th Cir. 2001) (quoting Giebel v. Sylvester, 244 F.3d

20  1182, 1198 (9th Cir. 2001)).

21          At the time at issue in this action, the requirement that prison doctors not act with

22  deliberate indifference to a prisoner's serious medical needs was well established.  See Estelle,

23  429 U.S. at 104-05.  Based on the evidence before the court, a jury might find Dr. Andreasen

24  should have been aware that declining to transfer plaintiff to G-3 where he would have consistent

25  access to a cookie sheet bed, in light of the fact that his chronos for a cookie sheet bed were not

26  /////

1  being followed, might cause plaintiff pain.  Dr. Andreasen therefore is not entitled to qualified

2  immunity.

3       D.  Lieutenant Pulsipher

4       Plaintiff argues that summary judgment is not appropriate at this time because

5  Pulsipher's affidavit demonstrates that more discovery is essential.  Opp'n at 9-10; see Fed. R.

6  Civ. P. 56(f).

7       Rule 56(f) of the Federal Rules of Civil Procedure permits a court to deny or

8  continue determination of a motion for summary judgment "should it appear from the affidavits

9  of a party opposing the motion that the party cannot for reasons stated present by affidavit facts

10  essential to justify the party's opposition."  A party's failure to comply with the requirements of

11  the rule is a proper ground for denying discovery and proceeding to summary judgment.

12  Brae Transp., Inc. v. Coopers & Lybrand, 790 F.2d 1439, 1443 (9th Cir. 1986).

13       Plaintiff's Rule 56(f) request is included in his memorandum of points and

14  authorities in opposition to the motion for summary judgment, not in a separate document and

15  not supported by an affidavit.  Opp'n at 10.  Nevertheless, this opposition is sufficient to raise

16  discovery concerns for the court's consideration.  Garrett v. City And County of San Francisco,

17  818 F.2d 1515, 1518-19 (9th Cir. 1987); Program Engineering, Inc. v. Triangle Publications, Inc.,

18  634 F.2d 1188, 1193 (9th Cir. 1980).

19       First, plaintiff claims that Pulsipher failed to comply with this court's December

20  29, 2005 order granting plaintiff's motion to compel in part and directing Pulsipher to produce

21  materials on the need to ensure that the transfer of inmates from M-1 to H-2 would not result in a

22  disruption of any of their medical needs.  Plaintiff claims Pulsipher gave plaintiff a copy of

23  orientation materials given to new inmates when they arrive at CMF, which had nothing to do

24  with the request.  Opp'n at 10 & Ex. K-1.

25       Plaintiff also argues that documentation on the move must have been generated,

26  because Pulsipher mentions an "organization" that was in charge of the move.  See MSJ, Ex. B

¶ 10 (the movement of inmates from M-1 to H-2 was the result of "a program change of which I was neither consulted nor was I assigned to the organization of the program change."). It appears that Pulsipher is not using the word "organization" to mean a group or entity, but rather the action or process of organizing; the group plaintiff believes must have generated documents did not necessarily exist. Nevertheless, the court is troubled by Pulsipher's response to the motion to compel, for if he in fact produced the "Mission Statement" included as Exhibit K-1 to the opposition, it was not responsive to the court's order. Defendant has not disputed plaintiff's characterization of what he provided plaintiff, but rather has simply argued that plaintiff is attempting to relitigate the motion to compel. Reply at 2-3.

In addition, plaintiff has suggested that even if Pulsipher was not involved in planning the move, his position as Program Lieutenant means he would have been given any memoranda or other documents relating to the move because the move disrupted programming on the unit. Any documents about the continuity of care and the distribution list for such documents would assist plaintiff in showing that Pulsipher was aware of plaintiff's need for a cookie sheet bed.

Second, plaintiff argues that in light of Pulsipher's claim that he investigated plaintiff's complaints about his bed on several occasions, he needs information about the investigation, including copies of documents Pulsipher reviewed and the names of the people he interviewed, if any. Opp'n at 12; see MSJ, Ex. B ¶ 7. He contends that he was not alerted to Pulsipher's claim that he investigated because Pulsipher's response to interrogatories did not mention any investigation. Opp'n at 12.

Pulsipher's position in the pending summary judgment motion is that he had little day-to-day contact with things like housing moves or needs for special beds and that these issues were routinely handled by his staff without his involvement. He also relies on his assertion that he was aware of plaintiff's need for a cookie sheet bed only through plaintiff's verbal complaints.
/////

1   MSJ, Ex. B ¶¶ 6, 9.  The discovery plaintiff seeks will support his opposition to the motion for

2   summary judgment and is, accordingly, appropriate in this case.  Garrett, 818 F.2d at 1519.

3           IT IS HEREBY ORDERED that:

4           1.  Defendant Pulsipher's motion for summary judgment is denied without

5   prejudice to being renewed following the limited reopening of discovery.

6           2.  Within thirty days of the date of this order, defendant Pulsipher is ordered to

7   provide plaintiff with documents on the need to ensure the transfer of inmates from M-1 to H-2 in

8   May 2001 would not result in a disruption of any of their medical needs, including the distribution

9   list for any such document, and with any documents Pulsipher consulted and the names of people

10  he interviewed when he investigated plaintiff's complaints about his bed.  If no such information

11  exists, defendant should so notify plaintiff.

12          3.  Any motion to compel, limited solely to the two categories of evidence

13  described in 2 above, are due fifteen days after plaintiff receives the documents, with opposition

14  due thirty days after any such motion to compel is filed, and any reply fifteen days after the

15  opposition is filed.

16          4.  Defendant Pulsipher's renewed motion for summary judgment, if any, is due

17  within thirty days after the resolution of any motion to compel or thirty days after the expiration of

18  the time for filing a motion to compel.  Opposition is due thirty days thereafter, and the reply

19  fifteen days after the opposition is filed.

20          IT IS HEREBY RECOMMENDED that the motion for summary judgment be

21  granted as to defendants Bick and Steevers and denied as to defendant Andreasen.

22          These findings and recommendations are submitted to the United States District

23  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

24  days after being served with these findings and recommendations, any party may file written

25  objections with the court and serve a copy on all parties.  Such a document should be captioned

26  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:  February 1, 2007.

_____
U.S. MAGISTRATE JUDGE

2/youn2225.57